UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-81659-CIV-MATTHEWMAN

HERSHEL ALLEN FORDYCE,

     Plaintiff,

v.

CAROLYN W. COLVIN[1],
Acting Commissioner of Social Security
Administration,

     Defendant.

_____/



## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 39, 40]

**THIS CAUSE** is before the Court upon Plaintiff, Hershel Allen Fordyce's ("Plaintiff"),

Motion for Summary Judgment with Supporting Memorandum of Law [DE 39], and Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security Administration's ("Defendant")

Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to

Plaintiff's Motion for Summary Judgment [DE 40]. Plaintiff filed a Reply [DE 44] to

Defendant's Response. The parties have consented to magistrate judge jurisdiction. *See* DE

16. The issues before the Court are whether the record contains substantial evidence to support

the denial of benefits to Plaintiff and whether the correct legal standards have been applied.

*Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] As of January 23, 2017, Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* Social Security Administration, *The Acting Commissioner of Social Security*, https://www.ssa.gov/agency/commissioner.html. However, for consistency, the Court will continue to use the party named in the Complaint, Carolyn W. Colvin. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I.   FACTS

On January 8, 2013, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, asserting a disability on-set date of March 24, 2011.   [R. 14].[2] The application was denied initially and upon reconsideration.   *Id.*   Following a video hearing on March 3, 2014, Administrative Law Judge Charles Woode (the "ALJ") issued a decision on April 25, 2014, denying Plaintiff's request for benefits.   [R. 11-28].   A request for review was filed with the Appeals Council and denied on November 12, 2015.   [R. 1-6].   Plaintiff's date last insured was December 31, 2016.   [R. 14].

### A. Hearing Testimony

The ALJ held a video hearing on March 3, 2014.   [R. 29].   Plaintiff stated that his date of birth was September 26, 1966, making him forty-seven years old at the time of the hearing. [R. 33].   He testified that he is separated from his wife and lives at his parents' house.   [R. 33-34].   Plaintiff stated that he has a driver's license and he drives twice a week for a total of about half an hour a week.   [R. 34-35].   According to Plaintiff, he did not graduate high school but he obtained his GED.   [R. 35].

Plaintiff testified that he worked as a traffic signal technician for Palm Beach County, an equipment operator for Lane County, and in the traffic signal department for Volusia County. [R. 36-37].   He explained that he stopped working because he fell while he was walking back to his vehicle one day while on a call working on a traffic signal.   [R. 35].   Plaintiff stated that his back swelled up from the blood and water not circulating to his legs properly, and now he has problems with his back staying swollen or tight, along with trouble with his neck and hands. [R. 36, 37].   Plaintiff testified that he stopped working on March 4, 2011, and has not worked

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 20.

since then. [R. 35].

According to Plaintiff, he sees two doctors on a regular basis. [R. 37]. One doctor is a neurologist, which he sees every two months and the other is his regular physician. *Id.* Plaintiff stated that he takes medication on a regular basis, which helps to alleviate his pain. *Id.* However, Plaintiff testified that he has side effects from the medication, such as dizziness and loss of memory. [R. 37-38]. According to Plaintiff, he does not go to physical therapy because his insurance will not cover the cost, he does not wear a splint or brace, and does not use a cane or other assistive device. [R. 38].

Plaintiff clarified that the $11,075 of income that he earned in 2011 was disability insurance that he received from his job. *Id.*

Plaintiff then testified as to his medical problems. [R. 39]. He stated that his pain is in his lower back and the right side of his neck. *Id.* Plaintiff described the pain as a "fairly sharp pain" that is constantly in the right side of his neck and his lower back from his right to left side. *Id.* Plaintiff estimated that he can sit for about twenty minutes at a time and stand for about five minutes at a time. *Id.* He testified that he could lift about ten pounds. [R. 40].

According to Plaintiff, he is also limited in use of both his hands because he has carpal tunnel syndrome, 100% in his left hand and 75% in his right hand. *Id.* Plaintiff testified that he has not had any treatment for the carpal tunnel. *Id.* He stated that if he does not take his medications then he frequently drops things. [R. 41]. Plaintiff described his pain in his arms as a tingling feeling from his fingertips up to his shoulders. *Id.*

Plaintiff testified that he cooks sometimes, about a half an hour a week. [R. 41]. He stated that he also does dishes about once a week, mops the floors once a week, takes out the trash, and goes to church twice a week. [R. 41-42].

3

Next, Deborah Determan, a vocational expert, testified. [R. 43]. She classified Plaintiff's past work as a traffic signal tech as skilled with an SVP level of 7 in the medium exertional work category, and Plaintiff's past work as a heavy equipment operator as skilled with an SVP level of 6 in the medium exertional category. [R. 44]. The ALJ posed the vocational expert a hypothetical in which an individual could work at the sedentary exertional level and the individual could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, never climb ladders, ropes, or scaffolds, can frequently handle and feel with the left and right hand, and should avoid exposure to vibrations and avoid even moderate exposure to hazards such as unprotected heights and dangerous machinery. *Id.* Given those facts, the expert found that the individual could not perform past relevant work as performed or as generally performed in the national economy. *Id.* However, the expert stated that the individual could perform other jobs at the sedentary exertional level, such as a document preparer, a call-out operator, and a telephone quote clerk. [R. 45]. Next, the ALJ posed a hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual could not sustain the requirements of full-time work for eight hours a day, five days a week. *Id.* The expert stated that if the individual were so limited, then that would eliminate the jobs she stated. *Id.*

### B.  Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

Plaintiff began seeing Dr. Federico C. Vinas for his neck and lower back pain in July of 2009. [R. 221-23]. Dr. Vinas noted that Plaintiff suffered from chronic neck pain and lumbar pain that had started several years earlier, and worsened "in a progressive fashion without any accident, fall or other precipitating factor." [R. 221]. Plaintiff's neck pain was in the left side

4

of his neck and radiated down to his left shoulder and left upper extremity down to his hand. *Id.* The neck pain was exacerbated by physical activity. *Id.* He also had back pain located in his mid-lumbar region that extended to his paraspinal area, to both of his thighs, and down to his feet. *Id.* Plaintiff reported "tingling and numbness in the left arm and leg, as well as decreased sensation on the anterolateral left upper extremity and posterior left lower extremity." *Id.* Plaintiff's pain failed to improve after physical therapy, multiple anti-inflammatories, muscle relaxers, and pain management. *Id.* Plaintiff had decreased range of motion in flexion, extension, bilateral bending, and rotation in his cervical spine, consistent with age-related spondylosis. [R. 222]. Plaintiff also had decreased range of motion in all directions with pain upon flexion and extension in his lumbar spine. [R. 223]. Finally, Plaintiff's gait was abnormal and he had a limp due to his pain. *Id.* Dr. Vinas examined x-rays and an MRI from 2007, showing Plaintiff had degenerative disc disease at L5-S1, a bulging disc at L1-2, and a bulging disc resulting in mass effect on the S1 nerve roots bilaterally. *Id.* The doctor recommended that Plaintiff undergo another MRI of his lumbar spine for updated results. *Id.*

Plaintiff received another MRI on October 8, 2009, and then presented to Dr. Vinas again. [R. 219-20]. Dr. Vinas said the MRI shows degenerative changes at L1-2 with disc dessication and mild disc space narrowing and degenerative changes at L5-S1 with a broad-based osteophytic/disc complex without significant mass effect or focal stenosis. [R. 219, 230-31]. Plaintiff elected to continue with conservative pain management and Dr. Vinas wrote him a prescription for an anti-inflammatory, Gabapentin, and referred him to Dr. Fulton for restoration of the lumbar spine. [R. 220]. Dr. Vinas counseled Plaintiff to avoid lifting excessive weights or any which may result in stress over the spine. *Id.*

On February 3, 2011, Plaintiff had another MRI of his lumbar spine done, which showed multi-level degenerative disc disease with disc bulges at L1-2 and L4-5, facet arthropathy with neural foraminal stenosis at L5-S1, and severe loss of disc space height at L5-S1.   [R. 216, 226].   There was no significant disc herniation or canal stenosis.   *Id.*   Further, x-rays showed degenerative disc disease, the most severe of which was at L5-S1 and L1-2.   *Id.*   Dr. Vinas diagnosed Plaintiff with severe lumbar spondylosis, chronic low back pain, lower extremity radiculopathy, and cervical spondylosis with left upper extremity radiculopathy without clinical evidence of myelopathy.   *Id.*   Dr. Vinas noted that Plaintiff's extreme pain affects his daily activities, causes him to have very poor quality of life, and causes him to be "unable to currently work as a signal technician, however he should be able to perform some sedentary activities." [R. 216-17].   Moreover, Dr. Vinas recommended that Plaintiff undergo a L1-2 discogram with a post discogram CT to see if surgery would benefit him.   *Id.*

Plaintiff had an L1-2 discogram performed in April of 2011 and presented to Dr. Vinas again.   [R. 212-14].   Dr. Vinas stated that the discogram was negative, showing a mid-annular tear without stenosis.   [R. 213, 225].   Therefore, Dr. Vinas believed that Plaintiff would not benefit from a surgical procedure at L1-2.

Further, on April 25, 2011, Dr. Vinas opined that Plaintiff was not maximizing nonsurgical pain management, and he referred him to an interventional pain specialist "for a trial of epidural steroid injections or other procedures."   [R. 214].

When Plaintiff reported back to Dr. Vinas on June 15, 2011, he reported that he injured his back at work.   [R. 206-08].   Plaintiff returned to discuss further alternatives to treatment. [R. 206].   Plaintiff also had an EMG and nerve conduction velocity studies performed on May 18, 2011, which were normal without evidence of lower extremity radiculopathy or peripheral

6

neuropathy.  [R. 207, 224].   Dr. Vinas partially completed a Work Status Report on the same date, indicating that Plaintiff should be excused from all work duties "based on the job description provided by [him]."  [R. 236].

Plaintiff presented to Dr. Stuart B. Krost for the first time on August 12, 2011 for pain management.  [R. 238].   Plaintiff complained of "severe pain in his lower lumbar area, cervical area and throughout his thoracic spine due to wear and tear throughout the years on his back."  *Id.*  Dr. Krost noted that Plaintiff did physical therapy without improvement and underwent a series of interventional injections without benefit.  *Id.*  Dr. Krost reviewed Plaintiff's MRI results from February 3, 2011, and noted that Plaintiff had a disc bulge at L1 to L4-5, a severe loss of disc space height at L5-S1, and evidence of degenerative disc disease at L5-S1, L1, and L2.  *Id.*  Plaintiff exhibited poor heel to tow walking and a discrepancy in his leg length.  [R. 239].   Plaintiff had increased pain at flexion, extension, and lateral rotation in his cervical spine and lumbar spine.  [R. 239-40].  Dr. Krost concluded that Plaintiff developed cervicalgia, mechanical low back pain, and reactive myofascial spasm, and had clinical signs and symptoms suggestive of lumbar radiculitis and lumbar facet arthrosis secondary to mechanism of injury.  [R. 240].  Dr. Krost recommended that Plaintiff continue his rehabilitative therapy and home exercise program and consider cervical, thoracic, and lumbar epidural injections.  *Id.*

Plaintiff continued to report to Dr. Krost for a few years.  [R. 242-301].   In September of 2011 Plaintiff reported that his medications were helpful in controlling his pain and he denied any medication related side effects.  [R. 242].   However, Plaintiff was still experiencing pain in the neck, mid back, low back area, right shoulder, elbow, hand, hip, knee, ankle and foot.  *Id.*  Dr. Krost renewed Plaintiff's medications.  [R. 244].

On August 9, 2012, Plaintiff complained to Dr. Krost of some short-term memory issues. [R. 278]. Plaintiff also noted having increased anxiety in September of 2012 when he was separating from his wife. [R. 281]. Dr. Krost recommended that Plaintiff receive a "psych" evaluation for possible depression. [R. 283]. Further, Plaintiff began going to the chiropractor to receive adjustments in April of 2013 and reported that they helped with his pain. [R. 350]. As of April 11, 2013, Plaintiff still denied any medication related side effects. *Id.*

Plaintiff filled out a Disability Report—Adult on February 13, 2013. [R. 151-58]. Plaintiff listed degenerated disc spondolitis as the physical condition that limits his ability to work. [R. 152]. According to Plaintiff, he stopped working because of his condition but his condition did not cause him to make changes in his work activity. *Id.* In his job duties as a traffic signal technician, Plaintiff estimated that he walked eight hours per day, stood eight hours per day, climbed six hours per day, stooped two hours per day, kneeled one hour per day, crawled one hour per day, handled large objects five hours per day, wrote one hour per day, and reached six hours per day. [R. 154]. Plaintiff also stated that he frequently lifted fifty pounds or more. *Id.*

Then, Plaintiff filled out a Supplemental Pain Questionnaire on April 9, 2013. [R. 159-61]. Plaintiff stated that his lower back gets swollen and his nerve area pain is severe. [R. 159]. According to Plaintiff, his pain is caused by him walking or standing, and he can only sit for approximately fifteen minutes. *Id.* Plaintiff claimed that his pain lasts all day but that his medication helps relieve "some pain for a few hours." [R. 160]. However, Plaintiff said that the medication causes him to be groggy and unable to drive. *Id.* According to Plaintiff, he can only cook easy meals and microwave meals, has to sit on the tub with a bench, does some light dusting around the house, cannot do laundry but tries to help fold, does not do any

8

shopping, can only sleep two to three hours at a time, only drives to doctor appointments, needs a cane to get around, and for social activities he only reads.   [R. 160-61].

On May 9, 2013, Plaintiff filled out a Disability Report—Appeal, claiming that his condition had worsened and he had complete numbness from his shoulders to his toes, was unable to walk without a cane, and was severely depressed.   [R. 166-71].   Plaintiff also alleged that his body was numb 90% of the day, he could not pick up objects because his fingers were numb and swollen, and he had poor balance because both his legs were swollen.   [R. 166]. According to Plaintiff, the pain in his back shifted from the left area to the right area and then went down to his legs.   [R. 167].   Further, in another Disability Report-Appeal, dated July 9, 2013, Plaintiff alleged that he would get disabling headaches and needed reminders to take his medication and go to his doctor's appointments.   [R. 190-96].

On May 28, 2013, Plaintiff completed a Function Report—Adult.   [R. 177-84]. Plaintiff claimed that he cannot do any physical work, cannot sit or stand for more than fifteen minutes, and cannot get out of bed without taking pills for his pain.   [R. 177].   According to Plaintiff, he has tried ice, heat, and physical therapy to try and reduce the swelling in his back but nothing has worked.   *Id.*   Plaintiff alleged that, due to his condition, he can no longer work, exercise, go camping, bend, lift things, walk, run, or remember things.   [R. 178].   He also stated that he can no longer cook for himself, perform household chores, or do yard work.   [R 179].   Plaintiff noted that he does get around by driving when he has "not taken too many pills," and that he goes to the pharmacy, church, store, bank, and doctor's appointments.   [R. 180, 181].   Plaintiff asserted that he can pay bills, count change, handle a savings account, and use a checkbook/money order, but stated that he cannot think clearly and he gets confused.   [R. 180-81].   According to Plaintiff, on Saturdays, Sundays, and Tuesdays he goes to church, goes

to the Kingdom Hall of Jehovah's Witnesses, and goes door to door to speak to people about the Bible. [R. 181]. Plaintiff alleged that he has problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, and using his hands. [R. 182]. However, Plaintiff stated that he has no problems getting along with family, friends, neighbors, or authority figures. [R. 182-83]. Plaintiff did not indicate that he used any sort of walker or cane in this Report. [R. 183].

Dr. Audrey Goodpasture performed a Residual Functional Capacity assessment on May 31, 2013. [R. 63-65]. Dr. Goodpasture determined that Plaintiff's exertional limitations were the following: occasionally lifting or carrying ten pounds, frequently lifting or carrying less than ten pounds, standing and/or walking for a total of four hours in an eight-hour workday, sitting for a total of six hours in an eight-hour workday, and unlimited pushing or pulling. [R. 63]. The doctor determined that Plaintiff's postural limitations were never climbing ladders, ropes, or scaffolds, occasionally balancing, occasionally stooping, occasionally kneeling, occasionally crouching, and occasionally crawling. [R. 64]. Dr. Goodpasture noted that Plaintiff had no manipulative, communicative, or visual limitations. *Id.* As far as environmental limitations, Dr. Goodpasture stated that Plaintiff should avoid concentrated exposure to vibration and avoid even moderate exposure to hazards such as machinery or heights. *Id.* On June 19, 2013, Dr. Susan Shapiro, completed a Disability Determination Explanation. [R. 58-66]. Dr. Shapiro determined that Plaintiff suffered from one severe impairment—Disorders of Back—Discogenic and Degenerative. [R. 62]. Plaintiff also alleged that he was now depressed but the doctor was unable to obtain evidence to substantiate this claim and therefore found it was insufficient. *Id.* In conclusion, Dr. Shapiro did not make a finding as to Plaintiff's ability to perform his past

relevant work, but she stated that, based on the RFC, Plaintiff would be able to perform sedentary work.   [R. 66].   She found Plaintiff to not be disabled.   *Id.*

Plaintiff presented to Dr. Jerome Vincente for lower back pain in July of 2013.   [R. 356].   Dr. Vincente found that Plaintiff had multilevel discogenic disease with disc space narrowing at L1-L2 and L5-S1, chronic endplate change at the inferior endplate of L5, multilevel neural foraminal stenosis related to facet bony changes, and asymmetric disc bulge on the right at L1-L2.   [R. 356-57].   In August of 2013, Dr. Vincente stated that Plaintiff's severe back pain limits his ability to work or conduct daily activities.   [R. 374].   Dr. Vincente noted that Plaintiff's blood test showed "EBV, CMV viruses" which "can account for his chronic fatigue, malaise and weakness amplifying his lumbar pain making the activities of everyday living difficult."   *Id.*

Dr. Allen H. Bezner, a neurologist, started seeing Plaintiff in August of 2013.   [R. 358-63].   Dr. Bezner noted that Plaintiff had an MRI performed a few days before seeing him, which showed degenerative disc disease but no herniated discs or evidence of spinal stenosis.   [R. 358].   Dr. Bezner concluded that Plaintiff had lumbar myofascial pain syndrome.   [R. 359].   Dr. Bezner recommended that Plaintiff see a rheumatologist "to make sure he does not have any other problems...as his MRI is rather benign and out of proportion to the degree of pain that he is alleging."   *Id.*

In November of 2013, Plaintiff suffered a sprained neck and went to JFK Medical Center.   [R. 384-86].   He had decreased range of motion bilaterally and tenderness in his neck.   [R. 424].   There was no evidence of an acute fracture.   [R. 424-25].

Plaintiff continued to see Dr. Bezner, and he noted in November of 2013 that Plaintiff also had carpal tunnel syndrome, especially in the left side, and should consider hand surgery.

[R. 365-66].   Then, in December of 2013, Plaintiff had an MRI of his cervical spine performed. [R. 367].   Dr. Bezner concluded that Plaintiff had a "four millimeter cyst versus hemangioma in the body of C7", a tiny posterior central disc protrusion at C3-4 with no significant canal or neural foraminal stenosis, low profile disc protrusion on the right posteriorly at C6-7 with very minimal extrusion behind the endplates and no significant canal or neural foraminal stenosis, and moderate degenerative disc disease at C3-4 and C4-5.   [R. 368].

From May of 2013 through January of 2014, Plaintiff continued to see Dr. Krost for follow-up visits, complaining of low back, neck, and mid back pain.   [R. 392-418].   Plaintiff reported that he did not have any side effects from his medications and requested medication renewals.   [R. 416].   Plaintiff stated that the Percocet he takes keeps his pain tolerable.   [R. 407].   Then, in January of 2014, Plaintiff reported that he had increased pain that month, which the doctor thought may have been due to the cold weather.   [R. 392, 394].

In a Medical Statement dated February 4, 2014, Dr. Krost opined that Plaintiff could sit and stand for only thirty minutes at one time, could work four hours a day, could occasionally lift ten pounds, and could frequently lift five pounds.   [R. 419].   He further stated that Plaintiff could occasionally bend, stoop, balance, raise his left and right arms over shoulder level, and raise his legs.   *Id.*   He found that Plaintiff could constantly perform manipulation with his left and right hands.   *Id.*   Finally, Dr. Krost opined that Plaintiff's suffers from severe pain.   *Id.*

## C. ALJ Decision

The ALJ issued his decision on Plaintiff's claim for benefits on April 25, 2014.   [R. 14-23].   The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled.   [R. 15-16].   He found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in

12

substantial gainful activity since March 24, 2011, the alleged on-set date. *Id.* The ALJ then found that Plaintiff suffers from the following severe impairments: degenerative disc disease, left-sided carpal tunnel syndrome, hypertension, and high cholesterol. *Id.*

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* The ALJ noted that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments." *Id.* Further, the ALJ found "substantial evidence that [Plaintiff], as an individual with obesity, experiences greater pain and functional limitation than might be expected from his medically determinable impairments individually." [R. 17].

The ALJ then completed a residual functional capacity ("RFC") assessment and found that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). *Id.* Specifically, the ALJ stated that Plaintiff could "occasionally balance, stoop, kneel, crouch, crawl and climb stairs," but was unable to climb ladders, ropes, scaffolds. *Id.* Further, the ALJ stated that Plaintiff could "frequently handle and feel with his hands bilaterally, and should avoid concentrated exposure to vibration and even moderate exposure to hazards including dangerous machinery and unprotected heights." *Id.* The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.*

The ALJ then followed the two-step process—first, determining whether there is an

13

underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. *Id.* The ALJ went through the various medical records in extensive detail. [R. 17-21]. The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [R. 18]. He further found that Plaintiff's diagnostic testing results fail to support Plaintiff's assertion that his conditions are disabling. *Id.*

In terms of the opinion evidence, the ALJ explained that his RFC assessment was "influenced by the opinion of [Plaintiff's] pain management physician, Dr. Krost." [R. 20]. Further, the ALJ assigned "some weight" to Plaintiff's neurosurgeon, Dr. Vinas' opinion because his opinion "was likely more relevant in 2011, shortly after [Plaintiff's] accident, however, he ha[d] demonstrated improvement with prescribed medication since that time on a consistent basis." [R. 21]. The ALJ stated that he based his RFC assessment "in large part on the opinion of Dr. Goodpasture, the medical consultant from the Disability Determination Service" because it was consistent with Plaintiff's medical records and allowed for symptom interference. *Id.*

The ALJ next concluded that, considering the Plaintiff's RFC, Plaintiff was unable to perform his past relevant work because it exceeds the RFC. [R. 22]. The ALJ noted that this conclusion was supported by the hearing testimony of the vocational expert. *Id.* The ALJ, however, did note that there were sedentary jobs that exist in significant numbers in the national

economy that Plaintiff could perform, including document preparer, call-out operator, or telephone quote clerk.   [R. 22-23].

Finally, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from March 24, 2011, through the date of this decision."   [R. 23].

## II.   MOTIONS FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment with Supporting Memorandum of Law, Plaintiff makes three main arguments. [DE 39].   First, he argues that the ALJ erred by improperly rejecting the opinion of Plaintiff's treating physician, Dr. Krost.   [DE 39, pp. 9-11].   Next, Plaintiff asserts that the ALJ erred in "failing to address the statement of Dr. Vincente that Plaintiff's Epstein-Barr Virus, Cytomegalovirus, and Mycoplasma Antibodies accounted for his augmented symptoms."   [DE 39, pp. 11-12].   Finally, Plaintiff claims that the ALJ's credibility finding is unsupported by substantial evidence and based on a flawed rationale.   [DE 39, pp. 12-14].   Therefore, Plaintiff asks that this Court reverse the denial of Plaintiff's application for disability benefits and remand this matter for further administrative proceedings. [DE 39, p. 14].

In Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, she argues that substantial evidence supports the ALJ's evaluation of Plaintiff's treating physicians.   [DE 40, pp. 8-13].   Defendant next claims that the ALJ adequately considered the statement of Dr. Vincente.   [DE 40, pp. 13-15].   Further, Defendant maintains that substantial evidence supports the ALJ's finding that Plaintiff's symptoms were not as severe as alleged.   [DE 40, pp. 15-20].

Plaintiff filed a Reply [DE 44] to Defendant's Motion for Summary Judgment maintaining all of his arguments.   Plaintiff claims that Dr. Vincente's medical opinion and

diagnoses "have direct bearing on both the credibility and residual functional capacity evaluations" of Plaintiff.   [DE 44, p. 5].   Plaintiff also asserts that the ALJ did not provide substantial evidence in support of his negative credibility finding of Plaintiff.   [DE 44, p. 7].

### III.   LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards.   Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)).   Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]."   *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact.   No presumption of validity attaches to the Commissioner's conclusions of law.   *Brown v. Sullivan*, 921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir. 1990).   "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal."   *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability.   20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f).   The ALJ must first determine whether the claimant is presently employed.   If so, a finding of non-disability is

made, and the inquiry concludes.   20 C.F.R. § 404.1520(b).   In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments.   If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends.   20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments.   20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work.   *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985).   If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded.   20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work.   If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established.   20 C.F.R. § 404.1520(e).   The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience.   20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.   In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert.   *See Phillips*, 357 F. 3d at 1239-40.

The Eleventh Circuit has established a three part "pain standard" to be utilized by the

17

ALJ when a claimant tries to "establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991). The standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* Moreover, "[t]he claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Id.* The ALJ must specifically explain why he or she is deciding to discredit such testimony, and "[f]ailure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Id.*

A. Whether the ALJ improperly discounted the opinion of
Plaintiff's treating physician, Dr. Krost

Plaintiff contends that the ALJ erred in rejecting the opinion of Plaintiff's pain management specialist, Dr. Krost, which limited Plaintiff to part-time sedentary work. [DE 39, p. 9]. According to Plaintiff, the ALJ's rationale was flawed and "failed to properly consider the extensive treatment records supporting Dr. Krost's opinion." *Id.* Plaintiff claims that the ALJ did not assign a specific weight to Dr. Krost's opinion and did not provide adequate reasons for discounting Dr. Krost's opinion. *Id.* Specifically, Plaintiff asserts that the ALJ did not cite any conflicts with the medical evidence after concluding that Dr. Krost's opinion diverged from the other medical evidence. *Id.* According to Plaintiff, "Dr. Krost's opinion is consistent with that of the objective medical evidence of record and consultations from specialists." [DE 39, p. 10]. Plaintiff argues that the ALJ erred in relying on Dr. Goodpasture's opinion because Dr. Goodpasture was not an examining physician and his opinion was based on an incomplete record

18

and flawed rationale. *Id.*   Finally, Plaintiff claims that Dr. Vinas' opinion is consistent with Dr. Krost's opinion limiting Plaintiff to only four hours of sedentary work activity.   [DE 39, p. 11].

Defendant claims that the ALJ had good cause to give Dr. Krost's opinion less than controlling weight because it was unsupported by his own treatment notes and was inconsistent with the medical evidence.   [DE 40, pp. 9-10].   Further, according to Defendant, the medical evidence supported the opinions of both Dr. Vinas and Dr. Goodpasture that Plaintiff could perform sedentary work.   [DE 40, p. 10].   Defendant maintains that the ALJ gave Dr. Krost's opinion "less than controlling weight and only accepted it to the extent it showed Plaintiff could do sedentary work" and that the ALJ articulated adequate reasons for doing so.   [DE 40, pp. 10-11].

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F. 3d at 1440.   "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241.   If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

As Dr. Krost was a treating physician of Plaintiff, his opinion should have been accorded considerable weight unless the ALJ had good cause to not give it considerable weight and the ALJ clearly articulated his reasons for doing so.   First, the ALJ extensively discussed Dr. Krost's treatment notes and his Medical Statement in his decision.   [R. 19-21].   Dr. Krost treated Plaintiff from August of 2011 through February of 2014 for pain management.   [R.

237-355; 392-418; 435-37].   Plaintiff complained of severe pain in his back and neck.   [R. 238].   However, Plaintiff continuously reported that his medications were helpful in alleviating that pain and he denied any side effects from his medications, and Dr. Krost also noted that adjustments Plaintiff received from a chiropractor were helpful.   [R. 242, 350, 416].   Therefore, Dr. Krost's treatment notes reflect that, as the ALJ stated in his decision, Plaintiff was not totally disabled.

Dr. Krost concluded in his Medical Statement, dated February 4, 2014, that Plaintiff could only work four hours in an eight-hour workday, could only sit and stand for thirty minutes at a time, and needed to elevate his legs occasionally.   [R. 419].   However, this was unsupported by his treatment notes.   There was no evidence in Dr. Krost's treatment notes that Plaintiff was so limited.   Dr. Krost repeatedly noted that Plaintiff had normal gait (although poor heel to toe walking) and normal motor strength (with some mild diffuse left upper and left lower extremity weakness compared to the right).   [R. 258, 261, 264, 267, 393, 411, 417].   Moreover, from May 2013 onward, Plaintiff presented to Dr. Krost with only a minimal amount of distress.   [R. 393, 402, 411, 417, 436].   As the ALJ found, Dr. Krost's opinion in his Medical Statement was inconsistent with his treatment records.

Dr. Krost's opinion was also inconsistent with the remaining medical evidence.   Dr. Vinas treated Plaintiff for his neck and lower back pain since 2009.   [R. 205-35].   In February of 2011, Plaintiff had an MRI of his lumbar spine performed, which showed no significant disc herniation or canal stenosis.   [R. 216].   Dr. Vinas concluded that, although Plaintiff could not perform his former work as a traffic signal technician, Plaintiff could perform "some sedentary activities."   [R. 216-17].   Plaintiff also had an EMG and nerve conduction velocity studies performed on May 18, 2011, which were normal without evidence of lower extremity

radiculopathy or peripheral neuropathy.  [R. 207, 224].

Moreover, Plaintiff's neurologist, Dr. Bezner, inspected one of Plaintiff's MRIs in August of 2013 and recommended that Plaintiff see a rheumatologist "to make sure he does not have any other problems...as his MRI is rather benign and out of proportion to the degree of pain that he is alleging."  [R. 359].  Therefore, substantial evidence supported the ALJ's decision to not give Dr. Krost's opinion considerable weight to the extent that he found Plaintiff could not perform sedentary activities.

Second, the ALJ did not disregard the opinion of Dr. Krost.  To the contrary, the ALJ explicitly stated that he "afforded Dr. Krost's opinion weight to the extent that it is consistent with the remainder of the medical evidence and Dr. Vinas' opinion from 2011 indicating that [Plaintiff] was capable of sedentary work."  [R. 21].  The ALJ went on to find that, given Plaintiff's carpal tunnel syndrome, Plaintiff should also be limited to frequent handling and feeling.  *Id.*  The ALJ, therefore, did explicitly place some weight on Plaintiff's treating physician's opinion, even though he did not state precisely what exact weight he was giving that opinion.

Third, the ALJ did articulate his reasons for not giving substantial or considerable weight to Dr. Krost's opinion.  After the ALJ thoroughly reviewed the medical evidence, the ALJ found that Dr. Krost's opinion "diverges from the remainder of the medical evidence."  [R. 21].  Further, the ALJ discussed inconsistencies between Dr. Krost's treatment notes and his Medical Statement, such as the fact that Plaintiff's pain was well-controlled with his prescription medication and the fact that the doctor's treatment notes did not mention Plaintiff needing to elevate his legs throughout the day.  *Id.*  Moreover, the ALJ stated that Plaintiff has been able to remain active with no reported side effects of his medication.  *Id.*  Therefore, the ALJ did

21

adequately articulate his reasons for only giving some weight to Dr. Krost's opinion.

Fourth, the ALJ only rejected Dr. Krost's opinion to the extent that he found that Plaintiff could not perform sedentary work.   A treating physician's opinion on issues that are reserved to the Commissioner, such as whether a claimant is unable to work or their residual functional capacity, is not entitled to controlling weight or special significance.   20 C.F.R. §§ 404.1527(d), 416.927(d)(1); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 Fed.Appx. 875, 878 (11th Cir. 2013).   Dr. Krost's opinion, to the extent that it finds that Plaintiff was unable to perform full-time sedentary work, is neither entitled to significant weight nor is it dispositive because it is an opinion on an issue reserved to the Commissioner.   *See* SSR 96-5p.

B.   Whether the ALJ erred in failing to address Dr. Vincente's opinion and statement

Plaintiff claims that the ALJ completely failed to address the opinion of Plaintiff's treating physician Dr. Vincente, resulting in harmful error.   [DE 39, p. 11].   According to Plaintiff, "Dr. Vincente's opinion could have altered the ALJ's decision if properly considered." [DE 39, p. 12].   Plaintiff's specific concern is with Dr. Vincente's opinion stating that Plaintiff was positive for EBV (Epstein-Barr Virus), CMV (Cytomegal-ovirus), and mycoplasma ab (Mycoplasma Antibodies), which contributed to Plaintiff's chronic fatigue, malaise, and weakness.   According to Dr. Vincente, these viruses could also worsen Plaintiff's lumbar pain "making the activities of everyday living difficult."   [R. 374].

According to Defendant, the ALJ did consider Dr. Vincente's opinion, which was in an August 2013 statement regarding Plaintiff's infections.   [DE 40, p. 13].   Defendant claims that Dr. Vincente's statement was not a medical opinion, just "a general statement that Plaintiff's infections could account for his lumbar pain but offered no clear judgment about the nature and severity of Plaintiff's impairments."   [DE 40, p. 14].   Further, Defendant asserts that Dr.

22

Vincente's statement did not provide any evidence that there were any functional limitations related to Plaintiff's infections and fatigue.   *Id.*

Contrary to Plaintiff's allegation, the ALJ explicitly addressed and cited to Dr. Vincente's opinion and treatment notes in his discussion of the medical record evidence.   [R. 18, 19].   He specifically addressed Dr. Vincente's statement about Plaintiff's viruses, noting that Plaintiff had "some fatigue in August of 2013 secondary to several infections" and citing to the statement. *Id.*   Therefore, Plaintiff's claim that the ALJ failed to address this statement and that the ALJ's opinion was "silent" regarding Dr. Vincente's opinion or treatment is false.   However, Plaintiff is correct that the ALJ did not assign Dr. Vincente's opinion a certain weight.

Assuming *arguendo* that the ALJ erred by not specifically stating the weight he gave to Dr. Vincente's opinion, that error is harmless.   In certain limited circumstances, "the failure of an ALJ to state the weight given to the medical opinion of a physician may be harmless error." *Ostos v. Astrue*, No. 11-23559-CIV, 2012 WL 6182886, at *13 (S.D.Fla. Nov. 20, 2012) (citing *Caldwell v. Barnhart*, 261 Fed.Appx. 188, 191 (11th Cir. 2008)).   Reversible error only exists if the ALJ's omission creates "an evidentiary gap that caused unfairness or clear prejudice." *Caldwell*, 261 Fed. Appx. at 190 (citing *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995)). In *Caldwell*, the court found that the ALJ's failure to discuss the weight given to an examining physician was harmless error because the limitations assessed by the physician would not have affected the claimant's ability to perform the job listed by the vocational expert.   261 Fed.Appx. at 191.   The court also noted that the examining physician's opinion did not contradict the ALJ's finding and was very similar to the opinion of another physician whose opinion was explicitly given substantial weight by the ALJ.   *Id.*

In *Cole v. Comm'r of Soc. Sec.*, No. 6:11-cv-1187-Orl-TEM, 2012 WL 4077233, at *7

(M.D. Fla. Sept. 17, 2012), the court first noted that the ALJ was obligated to consider a specific psychologist's report. The court then explained that, while the ALJ had not specifically referred to the report in her decision, the ALJ's failure to do so was harmless error since nothing in the report indicated that the claimant was more limited than the ALJ determined in her analysis of the claimant's functioning in each domain. *Id.* The court noted that "failure to explicitly refer to a piece of evidence is not determinative *per se* of whether that evidence was considered." *Id.* It emphasized further that the report was completed by an examining source who had not treated the claimant on a long-term basis. *Id.* The court concluded, "[e]xplicit discussion of the contents of this report would not have altered the ultimate decision finding [the claimant] was not disabled under the Social Security Act." *Id.*

Likewise, in *Denomme v. Astrue*, No. 3:11-CV-105-CDL-MSH, 2012 WL 3066001, at *3 (M.D. Ga. June 21, 2012), *aff'd,* 518 Fed.Appx. 875 (11th Cir. 2013), the court found that the ALJ's failure to cite explicitly the opinion of the state agency psychologist was not reversible error as the ALJ's findings demonstrated that he had, in fact, considered the opinion despite not discussing it at length. The court explained that the ALJ included in the plaintiff's RFC the plaintiff's need to have limited contact with the public and that this finding was drawn from the psychologist's opinion. *Id.* The court also stated that the ALJ's decision was "further based on his finding that the symptoms and limitations as subjectively alleged by the Claimant were credible only to the extent that Claimant could perform work as prescribed by the RFC finding." *Id.* The court held that "it is apparent from the ALJ's decision that he did not discredit the state agency consultant's findings and what weight he gave to those opinions can be inferred from his RFC finding." *Id.* The court then held that "[i]t is clear that the failure by the ALJ to explicitly state the weight he gave to the opinions of the examiners was harmless in that it did not

24

create an evidentiary gap in the record which caused unfairness or clear prejudice to Claimant. Thus, no error [was] found." *Id.* at *4.

Similarly here, the ALJ's failure to explicitly discuss precisely how much weight he gave Dr. Vincente's opinion and diagnoses, if it is error at all, is harmless error because it did not create an evidentiary gap in the record which caused unfairness or clear prejudice to Plaintiff. *See Denomme*, 2012 WL 3066001, at *4. Dr. Vincente's opinion in his statement that Plaintiff's lumbar pain could make the activities of everyday living difficult did not specifically state Plaintiff's limitations or how they would affect Plaintiff's ability to perform sedentary work. Further, Dr. Vincente's opinion did not contradict the ALJ's finding. Nothing in Dr. Vicente's treatment notes or statement indicated that Plaintiff was more limited than the ALJ determined in his analysis of Plaintiff's residual functional capacity.

This is not a case where the ALJ failed to consider and address the treatment notes of Dr. Vincente. To the contrary, he specifically referred to them in his decision. [R. 19]. The ALJ considered Dr. Vincente's findings in his detailed discussion of Plaintiff's alleged impairments. A careful review of the ALJ's opinion shows that he did "state with sufficient clarity the legal rules being applied and the weight accorded to the evidence presented." *Ryan v. Heckler*, 762 F.2d 939, 941 (11th Cir. 1985). Further, the ALJ did state "with at least some measure of clarity the grounds for his decision." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (citing *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam)). Accordingly, the ALJ's failure to explicitly assign a specific weight to the opinion of Dr. Vincente was harmless error, if an error at all.

C.   Whether the ALJ improperly discounted Plaintiff's subjective testimony

Plaintiff contends that the ALJ failed to apply the proper standard when he evaluated and rejected Plaintiff's complaints regarding his subjective symptoms.   [DE 39, p. 12].   Plaintiff asserts that the ALJ failed to articulate adequate reasons for discrediting Plaintiff's pain testimony.   *Id.*   Plaintiff also claims that the ALJ overlooked Plaintiff's additional diagnoses of Epstein-Bar Virus, Cytomegalovirus, and Mycoplasma Antibodies.   [DE 39, pp. 12-13]. According to Plaintiff, the ALJ improperly made a finding that Plaintiff's daily activities do not support a disabling impairment.   [DE 39, p. 13].   Plaintiff claims that his "minor personal and religious activities are not inconsistent with the ability to sustain only part-time sedentary activity."   [DE 39, p. 14].

Defendant asserts that the ALJ "properly found that Plaintiff's symptoms were not as limiting as he alleged, noting that objective evidence did not support his allegations."   [DE 40, p. 16].   According to Defendant, the substantial evidence is inconsistent with Plaintiff's allegation that he was disabled due to his back pain which limited his ability to sit, stand, or lift. *Id.*   Defendant maintains that the ALJ properly considered Plaintiff's use of medications, other treatments, and activities of daily living in evaluating Plaintiff's subjective complaints, and that the ALJ's credibility evaluation is supported by substantial evidence.   [DE 40, pp. 17-18]. Defendant claims that the ALJ applied the correct pain standard and offered specific reasons for rejecting Plaintiff's subjective complaints.   [DE 40, p. 18].

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."   *Holt,* 921 F. 2d at 1223.

26

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 17]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. [R. 17-21]. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the…residual functional capacity assessment." [R. 18].

The ALJ went through the various medical records in detail. [R. 17-21]. The ALJ found that Plaintiff's diagnostic testing results "fail to support [Plaintiff's] assertion that these conditions are disabling." [R. 18]. After a review of Plaintiff's MRI results in August of 2013, Dr. Bezner noted that Plaintiff's "rather benign" MRI was inconsistent with the degree of pain that Plaintiff was alleging. [R. 359]. As the ALJ concluded, the diagnostic testing results "failed to demonstrate significant abnormalities, instead identifying only mild to moderate degenerative disc disease without stenosis or radiculopathy, and bilateral carpal tunnel syndrome, deemed mild in [Plaintiff's] dominant right hand." [R. 19].

Then, the ALJ discussed the pain relief Plaintiff experienced after his use of medications and other treatments. [R. 19]. Plaintiff continuously reported to Dr. Krost that his medications alleviated his pain. [R. 242, 254, 275, 293, 395, 398, 401, 404]. Plaintiff also saw a benefit to receiving adjustments at the chiropractor. [R. 350]. The ALJ concluded that

Plaintiff's "history of largely conservative treatment does not support allegations of disabling conditions."   [R. 20].

Further, the ALJ found that Plaintiff's "broad range of daily living and community activities stands in contrast to [Plaintiff's] allegations of disabling symptoms."   [R. 20]. During the hearing in front of the ALJ, Plaintiff described his daily activities, which include driving twice a week for a total of about half an hour a week, cooking about half an hour a week, loading the dishwasher once a week, mopping once a week, paying his bills, cleaning the house, taking out the trash, and attending church twice a week.   [R. 34-35, 41-42].   Further, in a Function Report—Adult, dated May 28, 2013, Plaintiff stated that he reads, tries to exercise, watches television, goes walking, goes to church or to the Kingdom Hall of Jehovah's Witnesses, and goes door-to-door talking about the Bible.   [R. 177-84].   The ALJ thoroughly discussed these daily activities in his decision.   [R. 17-18].   The ALJ explained that Plaintiff's "broad range of daily living and community activities stands in contrast to [his] allegations of disabling symptoms."   [R. 20].

The Court finds that the ALJ followed the "pain standard" discussed in *Holt*.   As stated in *Holt*: "If the ALJ decides not to credit such testimony, he [or she] must articulate explicit and adequate reasons for doing so."   921 F. 2d at 1223.   After a careful review of the record, the Court finds that the ALJ did articulate explicit and adequate reasons for discrediting Plaintiff's testimony.   The ALJ cited multiple reasons for his finding.   This Court cannot reweigh the evidence.

The Court also finds that the ALJ properly considered Plaintiff's activities of daily living in evaluating Plaintiff's subjective complaints.   *See* 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i).   Moreover, the ALJ clearly only considered these activities to be one factor of

many in finding Plaintiff's complaints to not be credible.

The Court finds that the ALJ's decision to discount Plaintiff's testimony about his subjective complaints is not erroneous in light of the record evidence.   This is a case with an abundance of objective medical information which supports the ALJ's finding.   There is substantial evidence to support the ALJ's denial of benefits to Plaintiff.

## IV.   **CONCLUSION**

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**.   Accordingly, Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law [DE 39] is hereby **DENIED**, and Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment [DE 40] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 21st day of March, 2017.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE